EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Amparo Fuentes González<br><br>    Demandante-Recurrente<br><br>                v.<br><br> Ramón Badillo, Ada Padilla Aponte,<br> Sociedad de Bienes Gananciales<br> compuesta entre ambos y Félix<br> Padilla y otros<br><br>    Demandados-Recurridos | Certiorari<br><br>2003 TSPR 146<br><br>160 DPR _____ |

Número del Caso: CC-2000-939


Fecha: 30 de septiembre de 2003


Tribunal de Circuito de Apelaciones:
                    Circuito Regional II


Juez Ponente:
                    Hon. Héctor Urgell Cuebas

Abogado de la Parte Peticionaria:
                    Lcdo. Nelson Rosario Rodríguez

Abogado de la Parte Recurrida:
                    Lcdo. José A. Rivera Valencia


Materia: Nulidad de Compraventa y Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Amparo Fuentes González

    Demandante-Recurrente

       vs.

                             CC-2000-939    Certiorari

Ramón Badillo, Ada Padilla
Aponte, Sociedad de Bienes
Gananciales compuesta entre
ambos y Félix Padilla y otros

    Demandados-Recurridos

SENTENCIA

San Juan, Puerto Rico, a 30 de septiembre de 2003

Hoy nos toca determinar si en el presente caso el Tribunal de Primera Instancia tomó medidas apropiadas para garantizar el debido proceso de ley a una parte demandada que padece de algún grado de impedimento auditivo, en el acto del juicio.

## I.

El 9 de agosto de 1995, la peticionaria, Sra. Amparo Fuentes González presentó una demanda contra los recurridos, el Dr. Ramón Badillo Santiago, su esposa, la Sra. Ada Padilla Aponte, la sociedad de bienes gananciales compuesta por ambos y al Sr. Félix Padilla, hermano de la Sra.

Padilla. En ella solicitó la anulación del contrato de compraventa de su residencia habido entre la peticionaria demandante y los recurridos, más los daños y perjuicios. La parte recurrida contestó la demanda el 25 de octubre de 1995, y posteriormente presentó una contestación enmendada para incluir una reconvención en contra de la Sra. Amparo Fuentes González, reclamando la devolución del dinero recibido por ésta y una indemnización por los daños alegadamente sufridos por la parte recurrida como consecuencia de supuestos comentarios difamatorios hechos por la Sra. Fuentes.

**Durante el tercer día de la vista en su fondo**, cuando ya el recurrido, Dr. Badillo, había comenzado el desfile de su prueba, su representación legal solicitó la nulidad de la audiencia celebrada hasta entonces y un nuevo juicio por no haberse provisto un acomodo razonable para su impedimento auditivo, según requerido por el *Americans with Disabilities Act of 1990* (en adelante, ADA), 42 U.S.C.A. §§ 1201 et seq. Adujo éste que hasta ese momento, el Dr. Badillo no había podido entender la mayor parte del juicio, esto en violación de su derecho de confrontación que requiere que el demandado pueda escuchar la prueba para poder cooperar con el abogado. Como evidencia de su impedimento auditivo presentó un informe preparado por una audióloga clínica.

El foro primario se negó a anular el juicio llevado a cabo hasta ese momento y dispuso que se le proveyera una silla al demandado para ubicarla en cualquier lugar de la sala, instruyendo al Dr. Badillo que podía moverse libremente a donde escuchara, que si no entendía se podía levantar y avisar al Tribunal para que se repitiera. El juez explicó que los remedios eran de justicia sustancial **porque lo correcto hubiese sido la presentación de una moción con suficiente anticipación al juicio para minimizar el perjuicio a la parte demandante.**

Posteriormente, el tribunal dictó sentencia en la que declaró con lugar la demanda, ordenó la anulación de la compraventa, la cancelación de la inscripción del inmueble a favor de los demandados y el pago de veinte mil dólares ($20,000.00) por daños y perjuicios.

Inconformes, los demandados acudieron al Tribunal de Circuito de Apelaciones señalando la comisión de varios errores, entre ellos, que incidió el Tribunal de Primera Instancia al no proveer acomodo razonable al Dr. Badillo Santiago para su impedimento auditivo, según provee el ADA, 42 U.S.C.A. § 12101 et seq.

Mediante la sentencia dictada, el Tribunal de Circuito de Apelaciones dejó sin efecto la sentencia apelada y ordenó la celebración de un nuevo juicio con un acomodo razonable conforme al reglamento de ADA. Concluyó el Tribunal de Circuito de Apelaciones que el acomodo

ofrecido fue inadecuado de conformidad con lo requerido por el ADA; que el juez sentenciador debió haber paralizado los procedimientos y solicitado a la Oficina de Administración de Tribunales (OAT) la provisión de los instrumentos auxiliares requeridos por el ADA.[1]

La parte demandante acude ante nos y aduce que erró el Tribunal de Circuito de Apelaciones al anular la sentencia del Tribunal de Primera Instancia por el fundamento de haber violentado los derechos del demandado según reconocidos por el ADA; al sustituir su criterio por las determinaciones del juez que presidió la vista sin que mediara prejuicio o parcialidad; al anular una sentencia sin concederles una audiencia adecuada para refutar dichas alegaciones. En virtud de la interrelación entre los señalamientos de error, los discutiremos conjuntamente al analizar si erró el Tribunal de Circuito de Apelaciones al declarar un nuevo juicio en el presente caso.

## II.

Nuestro ordenamiento procesal permite al Tribunal de Primera Instancia "conceder un nuevo juicio a todas o cualesquiera de las partes y sobre todas o parte de las

---

[1] Por su parte, la Hon. Jueza Cotto Vives emitió una opinión disidente. Argumentó que el TPI proveyó el acomodo solicitado por la parte demandada durante el juicio. Según la disidencia, el Dr. Badillo escuchó todo el testimonio presentado, así como lo demás acontecido en el juicio, pudiendo proveer para su defensa; concluyó que el Dr. Badillo renunció en parte a cualquier acomodo adicional por no solicitarlo a tiempo.

cuestiones litigiosas", "[c]uando se descubriere evidencia esencial", "[c]uando no fuere posible preparar una exposición en forma narrativa de la evidencia, obtener una transcripción de las notas taquigráficas debido a la muerte del taquígrafo..." y "[c]uando la justicia sustancial lo requiere". Regla 48.1, Procedimiento Civil, 32 L.P.R.A. Ap. III. Véase, First Bank of P.R. v. Inmob. Nac., Inc., 144 D.P.R. 901 (1998); Riley v. Rodríguez de Pacheco, 119 D.P.R. 762 (1987). Bajo el inciso (c) de esta regla, el tribunal puede conceder un nuevo juicio por cualquier razón no contemplada en los dos previos incisos, siempre que se estime prudente y en bien de la justicia sustancial.

Esta disposición es igual a la regla federal que recoge viejos principios de[l] "common law" y que puede resumirse en tres: (1) error manifiesto en la aplicación del derecho; (2) error manifiesto en la apreciación de los hechos; y (3) nueva evidencia recién descubierta'. DR. JOSÉ A. CUEVAS SEGARRA, II TRATADO DE DERECHO PROCESAL CIVIL 777 (2000). Sin embargo, nuestra Regla 48.1 reconoce expresamente el fundamento de nueva evidencia y excluye los otros dos fundamentos del 'common law', expresando que sólo procederá un nuevo juicio cuando la justicia sustancial lo requiera. Por ello, a los fines de conceder un nuevo juicio, es insuficiente demostrar únicamente la comisión de un error en cualquier decisión u orden, o en

cualquier acto realizado u omitido por el tribunal. Sólo se concederá un nuevo juicio cuando tal error resulte ser incompatible con una sana administración de justicia, que impida una justa adjudicación o que el resultado sea injusto. Así la Regla 50 de Procedimiento Civil, 32 L.P.R.A. Ap. III, le niega consecuencia alguna a los errores no perjudiciales cometidos durante el trámite de un caso. Véase, Alicea Álvarez v. Valle Bello, 111 D.P.R. 847, 852-853 (1982).

En ocasiones anteriores, este Tribunal ha resuelto que "la concesión o denegación de un nuevo juicio descansa en la sana discreción del tribunal sentenciador" First Bank of P.R. v. Inmob. Nac.,Inc., 144 D.P.R. 901, 911 (1998), citando Carrión v. Sanpedro, 74 D.P.R. 413, (1953) nota al calce 1. Véase además, Riley v. Rodríguez, 119 D.P.R. 762 (1987); Ruiz Pérez v. Tribunal Superior, 94 D.P.R. 416 (1967). Por ello, en apelación o cualquier recurso de revisión, no se alterará ni revocará la sentencia apelada a menos que ello sea inconsistente con la justicia sustancial. Para poder sostener con éxito una revisión de "una resolución denegatoria de nuevo juicio es necesario demostrar que el tribunal abusó del ejercicio de su facultad discrecional al denegar dicha moción, o que se cometió una injusticia manifiesta al denegar la misma." First Bank of P.R. v. Inmob. Nac., Inc., supra, en la pág.

912. Véase además, DR. JOSÉ A. CUEVAS SEGARRA, II TRATADO DE DERECHO PROCESAL CIVIL 778 (2000).

Procede entonces, que determinamos si medió en este caso una injusticia de tal naturaleza que active el remedio provisto por la Regla 48.1 (c) supra, por razón del impedimento auditivo del recurrido. Esto es, ¿violentó el debido proceso de ley en su vertiente procesal el Tribunal de Primera Instancia al no tomar otras medidas para preservar el derecho del recurrido a un juicio justo? Para contestar esta interrogante, es innecesario recurrir a las obligaciones impuestas por el ADA a las entidades públicas ya que las mismas están concebidas en nuestro ordenamiento puertorriqueño como parte del debido proceso de ley.

## III.

La cuestión presentada ante nos requiere efectuar un balance de intereses para determinar si se ha violentado el debido proceso de ley del recurrido al celebrar el juicio sin proveerle el acomodo para su supuesto impedimento auditivo en la etapa en que el mismo fue solicitado. El Art. II, § 7 de la Constitución del Estado Libre Asociado, 1 L.P.R.A., al igual que la Enmienda XIV de la Constitución de Estados Unidos, 1 L.P.R.A., garantizan que: 'Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley.' El lenguaje de ambas disposiciones es idéntico, excepto que

en nuestra Constitución se eliminó la palabra "vida", como consecuencia de haberse proscrito la pena de muerte. Véase, Álvarez Elvira v. Arias Ferrer, res. el 13 de mayo de 2002, 2002 TSPR 31; Zapata Saavedra v. Zapata Martínez, res. 1 de marzo de 2002, 2002 TSPR 24; Rivera Rodríguez & Co. v. Lee Stowell, 133 D.P.R. 881 (1993).

El debido proceso de ley se manifiesta en dos dimensiones distintas: la sustantiva y la procesal. Bajo el debido proceso sustantivo, los tribunales examinan la validez de una ley a la luz de los preceptos constitucionales pertinentes, con el propósito de proteger los derechos fundamentales de las personas. Bajo este análisis, el Estado, al aprobar leyes o al realizar alguna actuación, no puede afectar de manera irrazonable, arbitraria o caprichosa —o sea sin adecuada justificación— los intereses libertarios o propietarios de algún individuo o grupo. Rodríguez Rodríguez v. E.L.A., 130 D.P.R. 562 (1992); Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265, 273 (1987). Por otro lado, la vertiente procesal del debido proceso de ley le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y propiedad del individuo sólo ocurra mediante un procedimiento *justo y equitativo*, que respete la dignidad de los individuos afectados. U. Ind. Emp. A.E.P. v. A.E.P., 146 D.P.R. 611, 616 (1998);

Rodríguez Rodríguez v. E.L.A., supra; López Vives v. Policía de PR, 118 D.P.R. 219 (1987).

Para activar la protección que ofrece este derecho en su vertiente procesal, tiene que existir un interés individual de libertad o propiedad. Rivera Santiago v. Srio. de Hacienda, supra; Board of Regents v. Roth, 408 U.S. 564 (1972). Cumplida tal exigencia, hay que determinar cuál es el procedimiento exigido ("*what process is due*"). U. Ind. Emp. A.E.P. v. A.E.P., supra; Rodríguez Rodríguez v. E.L.A., supra; Rivera Santiago v. Srio. de Hacienda, supra. Si bien la característica medular es que el proceso debe ser justo, éste no es rígido e inflexible; se ajusta a las exigencias constitucionales de cada contexto. Partido Acción Civil v. E.L.A., res. el 28 de febrero de 2000, 2000 TSPR 29; Mathews v. Eldridge, 424 U.S. 319 (1976). La jurisprudencia ha ido identificando componentes básicos del debido proceso de ley, tales como notificación adecuada y oportunidad de ser escuchado y de defenderse. U. Ind. Emp. A.E.P. v. A.E.P., supra; Rodríguez Rodríguez v. E.L.A., supra; Rivera Santiago v. Srio. de Hacienda, supra.

En Mathews v. Eldridge, 424 U.S. 319 (1976), el Tribunal Supremo de Estados Unidos estableció los tres (3) criterios que deben sopesarse al determinar cuál es el proceso debido para privarle a un individuo de algún derecho protegido. Estos factores son: (1) los intereses

individuales o privados que se verán afectados por la acción oficial; (2) el riesgo de una determinación errónea que prive a la persona del interés protegido mediante el proceso utilizado y el valor probable de garantías adicionales o distintas; y (3) el interés gubernamental protegido con la acción sumaria, inclusive la posibilidad de usar métodos alternos atendiendo la función que se trata y los cargos fiscales y administrativos que conllevaría la imposición de otras garantías procesales. Vélez Ramírez v. Romero Barceló, 112 D.P.R. 716 (1982) (adopta criterios de Mathews). Véase, U. Ind. Emp. A.E.P. v. A.E.P., supra, 616-617.

A la luz de los criterios de Mathews v. Eldridge, supra, la jurisprudencia ha establecido diversos requisitos que todo procedimiento adversativo debe cumplir para satisfacer las exigencias mínimas del debido proceso, a saber: (1) notificación adecuada del proceso; (2) proceso ante un juez imparcial; (3) oportunidad de ser oído; (4) derecho a contrainterrogar testigos y examinar la evidencia presentada en su contra; (5) tener asistencia de abogado, y (6) que la decisión se base en la evidencia presentada y admitida en el juicio. Rivera Santiago v. Srio. de Hacienda, supra, en la pág. 274; Rivera Rodríguez v. Lee Stowell, supra; Domínguez Talavera v. Tribunal Superior, 102 D.P.R. 423, 428 (1974); Pueblo v. Pérez

Santaliz, 105 D.P.R. 10, 23 (1976); Pueblo v. Andréu González, 105 D.P.R. 315, 320 (1976).

El derecho de toda persona de ser oído antes de ser despojado de algún interés protegido se ha consagrado como principio fundamental del debido proceso; esta oportunidad de ser oído debe ser en: *"a meaningful time and a meaningful manner."* Mathews v. Eldridge, supra, en la pág. 333; Antifascist Committee v. McGrath, 341 U.S. 123 (1951). La privación de la libertad o propiedad sin notificación u oportunidad de ser escuchado y de defenderse, se ha considerado siempre ajeno al debido proceso y en ocasiones es fuente de responsabilidad civil. Rivera Rodríguez v. Lee Stowell, supra, en la pág. 889-90; Lunar v. Edmondson Oil Co., 457 U.S. 922 (1982); Mullane v. Central Hanover Tr. Co., 339 U.S. 306 (1950).

Nuestra jurisprudencia ha reconocido en la esfera penal, el derecho de un acusado a un intérprete durante todo el procedimiento penal en virtud de la cláusula de debido proceso de ley, para que entienda los procedimientos llevados a cabo en su contra. En Pueblo v. Moreno González, 115 D.P.R. 298, 301 (1984), determinamos que violenta el principio de debido proceso de ley en su vertiente procesal el no proveer un intérprete a una persona que tiene graves problemas auditivos que dificultaban seriamente el oír y poder comunicarse con otros. Posteriormente, en Pueblo v. Branch, res. el 29 de

junio de 2001, 2001 TSPR 100, en el contexto de un acusado que no hablaba el idioma español, concluimos que "para un imputado que no entiende las incidencias de un procedimiento judicial, la asistencia de un intérprete durante todo el proceso adquiere una importancia tridimensional: *primero*, hace posible el interrogatorio de los testigos; *segundo*, facilita a los demandados o acusados poder entender la conversación entre abogados, testigos y el juez; y *tercero*, viabiliza la comunicación entre abogado y cliente." Asimismo, entendemos que en un juicio civil, es necesario que una persona con impedimentos auditivos se encuentre en condición de entender el procedimiento que se lleva a cabo, ya que el derecho a su propiedad o el disfrute de cualquier otro derecho, según sea el objeto del pleito, está en juego y una apropiada defensa requiere oír y entender los testimonios que se presenten y las manifestaciones del juez, las partes y sus abogados a través de todo el proceso. La extensión de este derecho depende, sin embargo, de las circunstancias particulares presentes en cada caso.

Una controversia judicial de naturaleza civil usualmente implica una disputa, monetaria o de otra índole, entre las partes. Por ello su ordenamiento procesal es más laxo que en los casos de naturaleza penal, enfocado en la búsqueda de una "solución justa, rápida y

económica" para las partes envueltas en el proceso. Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 1. Cuando el resultado de una litigación civil tiende a afectar intereses privados únicamente, la preocupación social en su adjudicación final es mínima porque el riesgo de una adjudicación errónea la comparten las partes litigantes en la misma proporción, aproximadamente. Véase, Nogueras v. Rexach Benítez I, 141 D.P.R. 470, 530 nota al calce 17 (1996) (op. conformidad del Juez Asociado Hernández Denton).

Por tratarse de intereses particulares los que están en juego en los casos civiles, de ordinario se observa menos rigurosidad en la revisión de tales procedimientos que en los casos criminales bastando con que el resultado final de la controversia sea justo.

Entendemos, sin embargo, que es ineludible la obligación de los tribunales de proveer el acomodo razonable de cualquier persona que por razón de un impedimento físico o mental no se encuentre en una posición equitativa en comparación con la otra parte. Esto es, el acomodo procede cuando el litigante, por razón de su impedimento, no puede disfrutar de los derechos reconocidos bajo el debido proceso de ley en su vertiente procesal que garantizan un juicio justo; a saber, el derecho a estar presente, entender los procedimientos, ayudar en su defensa, presentar prueba a su favor, entre

otros. Por tanto, todos los jueces del Tribunal General de Justicia del Estado Libre Asociado de Puerto Rico, vendrán obligadas a proveer el acomodo que razonablemente sea menester para garantizar tal derecho.[2]

Definimos como acomodo razonable aquel que dentro del contexto de los servicios prestados por el sistema de tribunales, no conlleva modificaciones de tal grado que alteran fundamentalmente la naturaleza del servicio, en este caso, del juicio en su fondo. El acomodo razonable debe asegurar un acceso significativo a los beneficios, derechos y garantías que conlleva la celebración de un juicio en su fondo, sin que esto se confunda con la creación o adición de beneficios sustantivos, distintos a los provistos para personas sin impedimentos. El propósito del acomodo razonable es facilitar el uso y disfrute de los servicios y derechos reconocidos, de una manera igual y equitativa entre todos los usuarios. Por ello, consideramos irrazonable aquél acomodo que imponga una desproporcionada carga económica o administrativa sobre el sistema de tribunales y sobre los usuarios.

De lo anterior podemos colegir que en el contexto de un juicio, la determinación de tal acomodo exige la

---

[2] Actualmente la OAT cuenta con recursos para proveer los acomodos mencionados en el Reglamento de ADA, como equipos de sonido infrarrojo portátiles. Advertido con razonable anticipación de la limitación auditiva de algún participante, el Juez debe solicitar al Juez Administrador la instalación del equipo en el salón de sesiones correspondiente.

consideración de los intereses de todas las partes afectadas por el proceso. Así, al determinar si el juicio en su fondo llevado a cabo en este caso fue uno justo, debemos también sopesar el derecho de la parte demandante a que el caso se resuelva prontamente; la política judicial que persigue la economía procesal; si se hizo justicia sustancial; el impacto económico a todas las partes y al Estado. Por ello es de vital importancia que consideremos, además, el momento en que se presentó la solicitud de acomodo, la calidad y el grado de evidencia presentada para demostrar el grado y extensión del impedimento —cuyo peso probatorio recae sobre quien alega el impedimento— a la luz de la apreciación de la evidencia hecha por el tribunal sentenciador. Estimamos de suma relevancia para la procedencia de cualquier reclamación de acomodo por una persona con un impedimento, la etapa procesal en que se hace: de este factor dependen otros factores esenciales para lograr un balance justo de los intereses envueltos. Considerados los factores antes mencionados, concluimos que no procede declarar un nuevo juicio en las circunstancias del presente caso. Veamos.

## IV.

El demandado, Dr. Badillo, hizo una referencia a su impedimento auditivo en la contestación a la demanda, al negar la alegación de la Sra. Amparo Fuentes de no haber

leído la escritura de compraventa. El párrafo número 20 en la alegación responsiva reza así:

> "Doña Amparo leyó cuidadosamente la escritura y disfrutó de todo el tiempo que ella requirió. El derecho a tener testigos y de ser leída en voz alta fue declinado y especialmente por mi que no oigo bien y dependo de audífonos."

Posteriormente, el 28 de diciembre de 1995, se enmendó la contestación a la demanda, para incluir unas defensas afirmativas y una reconvención. La alegación respondiente quedó pues alterada: esta vez el demandado simplemente se limitó a negar las alegaciones 12 a la 23 por falta de información y creencia, sin hacer referencia alguna a su impedimento. La antes citada alegación es la única referencia de cualquier naturaleza, hecha con anterioridad al juicio en su fondo, que consta en el expediente ante nos sobre el mencionado impedimento. Nada alegó la parte demandada sobre este extremo durante el proceso de descubrimiento de prueba, ni durante la conferencia con antelación al juicio.

No es hasta el 2 de septiembre de 1997, el primer día de la vista en su fondo y dos años después de iniciado el pleito, que la representación legal del Dr. Badillo _informa_ al tribunal sobre su limitación auditiva. <u>Aún en ese momento, sus abogados se limitaron a solicitar permiso para que el Dr. Badillo se pudiera sentar cerca de los testigos durante la vista para así escuchar mejor sus manifestaciones.</u> El tribunal concedió el permiso

solicitado y se continuó con el interrogatorio directo de la parte demandante. Una vez terminado el examen de la primer testigo, la Sra. Ada Padilla, esposa del demandado, la parte demandante sentó a testificar al propio demandado, el Dr. Badillo. Este comentó lo siguiente: "...le voy a pedir de favor, que el licenciado se mantenga en un solo sitio y no se esté moviendo, porque cuando él se mueve ocho pies para allá, de donde yo estoy, yo no le voy a oír, que se quede ahí en un solo sitio, aunque se acabe el dramatismo". Como respuesta el tribunal ordenó al abogado: "Desde el podio se dirige las preguntas. Vamos a evitar ese problema que tiene. Es un problema mecánico, de que no puede oírlo, si usted va cambiando, pues el oído de él no se ajusta." El abogado de la parte demandante accedió a lo solicitado. Según observamos en las transcripciones, en muy pocas ocasiones adujo el Dr. Badillo no escuchar las preguntas. Ciertamente, sus contestaciones correspondieron perfectamente a la pregunta en todas las ocasiones; en una ocasión solamente se le repitió una pregunta.

El segundo día de la vista en su fondo testificaron dos personas y la demandante, Sra. Amparo Fuentes. Durante el interrogatorio directo de ésta, la representación legal del Dr. Badillo le comentó al tribunal que su representado no pudo escuchar <u>bien</u> los testimonios vertidos. El tribunal permitió que se sentara

con el abogado en todo momento, o más cerca de la silla de testigos, si así lo deseaba. Entonces el Dr. Badillo expresó haber escuchado muy poco y el Tribunal mencionó para el récord, en síntesis, que el comportamiento del Dr. Badillo indicaba lo contrario.[3]

El lunes 8 de septiembre de 1997, antes que la parte demandada comenzara el desfile de su evidencia, la representación legal del Dr. Badillo Santiago presentó una solicitud formal sobre nulidad de los procedimientos y nuevo juicio por no haberse tramitado un acomodo razonable para su impedimento auditivo, según requerido por el ADA, supra. La moción alegó que hasta el momento, el Dr. Badillo no había podido entender la mayor parte del juicio. Como evidencia del impedimento, se adjuntó a la moción los resultados de un análisis efectuado dos días antes, esto es, el 6 de septiembre de 1997, por una audióloga clínica. El juez dio la moción por presentada y decretó un breve receso.

Reanudada la vista, el Juez denegó la moción en corte abierta. Dispuso, no obstante, que se le proveyera una silla al demandado para ubicarla en cualquier sitio dentro de la sala; indicó que el Dr. Badillo podía moverse

---

[3] El juez expresó: "lo he visto hacer gesticulaciones de aprobación y de negación al testimonio como si estuviese entendiendo y cuando..., me sorprendió, porque me llamó la atención, porque se había quejado de que no podía oír al licenciado tan cerca que él estaba hablando ni a mí tampoco, sin embargo, con lo bajito que hablaba ella, yo podía notar que él aparentemente-desde; o que yo estaba observando— sí entendía."

libremente a donde pudiera escuchar y si quería la repetición de algo, que avisara al Tribunal. El Tribunal expresó que hasta el momento se le había provisto un acomodo razonable, cónsono con sus solicitudes anteriores durante el juicio.

Entendemos que el juez sentenciador actuó correctamente. No consta evidencia en el expediente de prejuicio, arbitrariedad o capricho por parte del juez sentenciador al hacer las determinaciones en torno a la impresión de que el demandado escuchó la mayoría del testimonio. No procede alterarlas.[4] Por lo tanto

---

[4] La parte demandada presentó varias mociones al comienzo y en el transcurso del juicio en su fondo que el tribunal estimó tardías y frívolas, con la intención de dilatar los procedimientos. El Tribunal de Primera Instancia concluyó que la representación legal de la parte demandada no fue diligente en la tramitación del caso e intentaba dilatar los procedimientos, *antes* de haber presentado la moción de nuevo juicio y el demandado quejarse de su impedimento. Durante le primer día del juicio se presentó una moción de suspensión de vista por no haber obtenido las citaciones de los testigos de defensa. El tribunal la denegó porque la parte demandada solicitó la expedición de las citaciones tardíamente, sólo dos semanas antes de comenzar el juicio. Posteriormente, el notario autorizante de la escritura de compraventa no pudo comparecer a la vista en su fondo, por lo que la parte demandada volvió a solicitar la suspensión de los procedimientos. El tribunal resolvió en la negativa, señalando a la parte que estaba dilatando los procedimientos por ser ésta igual a la moción relativa a las citaciones. Esta moción se había presentado inmediatamente después de una segunda moción de suspensión presentada al ausentarse la señora esposa del demandado. En ella el Tribunal había concluido que la sociedad legal de gananciales quedaba debidamente representada por el Dr. Badillo y adecuadamente defendida por sus dos abogados. Comentó entender que "es una táctica que sólo traería dilación. Una acción que sólo trae dilación innecesaria." Posteriormente, la parte demandada presentó su cuarta

evaluamos la racionalidad del acomodo a la luz de la evidencia documental presentada.

En su informe, la audióloga clínica manifestó que el Dr. Badillo escucha a las personas hasta una distancia de cuatro (4) pies y de frente a ellos porque utiliza labio lectura. De modo que tenemos que el impedimento auditivo del demandado es uno parcial, sujeto a la distancia y volumen con el cual le hablan.

El juez permitió en todo momento que el Dr. Badillo estuviera cerca de los testigos, y éste aparentó estar satisfecho con el acomodo por un tiempo. Luego cuando testificó, el tribunal sentenciador ordenó a los abogados a hablar desde el podio únicamente en voz clara, para que el Dr. Badillo pudiera entender las preguntas. El tribunal concluyó, en virtud de la conducta y gestos del demandado, que éste escuchaba las incidencias del juicio porque asentía o negaba con la cabeza al escuchar a los testigos y hasta se sonrojaba ante la evidencia testifical. Cuando el Dr. Badillo informó que no había podido escuchar, y por primera vez requirió un acomodo conforme el ADA, se le proveyó una silla con ruedas y se le concedió libre movimiento por la sala para acomodarse en cualquier lugar desde donde pudiera escuchar mejor a los testigos, al juez o a los abogados. Se le permitió,

_____

moción, la de nuevo juicio por violentar los derechos del impedido.

además, interrumpir los procedimientos cada vez que no escuchara.

Concluimos pues, que erró el Tribunal de Circuito de Apelaciones al determinar que el acomodo provisto para el impedimento del Dr. Badillo era irrazonable. En virtud de la incapacidad auditiva parcial del Sr. Badillo, este acomodo fue razonable al ajustarse al grado de impedimento del cual adolece. Además, al analizar el proceso íntegramente, se torna patente que no se cumplen con el estándar de injusticia manifiesta, para declarar un nuevo juicio.

Entendemos que el proceso fue esencialmente justo para la parte demandada, considerados todos los intereses en conflicto. En el presente caso se presentó la demanda durante el mes de agosto de 1995, se contestó en octubre y ésta se enmendó en diciembre del mismo año. No es hasta comenzado el juicio en su fondo, dos años después de iniciada la reclamación, que el demandado presenta una petición de acomodo especial. En los autos no consta explicación alguna para esta tardanza.

La parte demandada pretende establecer que con la mención del impedimento en la contestación a la demanda original, el tribunal debió tomar conocimiento de su impedimento auditivo. Esta demanda original fue sustituida por una posteriormente enmendada. En su contestación a la misma nada se indica del impedimento ni

del grado de severidad del mismo. Ni la contestación original, ni la contestación a la demanda enmendada, eran suficientes para advertir al Tribunal de la necesidad de asistirle. Es más, al expresar en la contestación original que "no oigo bien y dependo de audífonos" el demandado da la impresión que utiliza su propio equipo auditivo. Por tanto, es forzoso concluir que el Tribunal no estuvo en posición para determinar la necesidad de algún acomodo adicional.

La irracional tardanza en plantear la necesidad de un acomodo razonable afecta adversamente a la parte demandante. La demandante ha sido diligente en la tramitación de su caso. Decretar un nuevo juicio por fundamentos no imputables a ésta ni al tribunal, después de los costos incurridos en la tramitación de este caso, tanto por la demandante como por el Estado, es demasiado oneroso, especialmente cuando el demandado pudo haber hecho su reclamo a tiempo evitando así la necesidad de celebrar un nuevo juicio. Con su demora, el Dr. Badillo renunció a reclamar tal derecho.

Por otro lado, estimamos que la celebración de un nuevo juicio no alteraría significativamente el resultado al cual ha llegado el Tribunal de Primera Instancia. Entendemos que sus abogados le proveyeron una adecuada defensa; tuvieron oportunidad de realizar todo el descubrimiento de prueba que garantizan las Reglas de

Procedimiento Civil, el cual no se dificultó, trabó, ni menoscabó por el impedimento auditivo del Dr. Badillo. Tampoco constan en el expediente problemas de comunicación entre el demandado y su representación legal durante el juicio o en los procedimientos preliminares.

En fin, concluimos que el acomodo dispuesto por el tribunal sentenciador fue suficiente y razonable, a la luz del informe de la audióloga, de las circunstancias particulares de este caso y de la apreciación que de la peculiar situación presente en el mismo hizo el tribunal sentenciador. Por ello entendemos que el juicio se condujo de manera justa y equitativa, a través de un procedimiento razonable. El acomodo provisto por el Tribunal de Primera Instancia cumplió con las exigencias del debido proceso de ley en este caso. Erró el Tribunal de Circuito de Apelaciones al anular la sentencia y declarar un nuevo juicio, cuando el juez de primera instancia no abusó de su discreción y tampoco cometió una injusticia manifiesta en la denegación del mismo.

Por los fundamentos antes expuestos, se revoca la sentencia dictada por el Tribunal de Circuito de Apelaciones y se devuelve el caso a dicho foro para que pase juicio sobre los demás errores señalados por los aquí recurridos en su recurso de apelación.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri concurre sin opinión escrita. El Juez Asociado señor Corrada del Río disiente por entender que el dictamen del Tribunal de Circuito de Apelaciones es sustancialmente correcto. El Juez Asociado señor Rivera Pérez disiente con opinión escrita.


                        Patricia Otón Olivieri
                    Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Amparo Fuentes González

      Peticionaria

         v.

Ramón Badillo, Ada Padilla
Aponte, Sociedad de Bienes          CC-2000-939      Certiorari
Gananciales compuesta entre
ambos y Félix Padilla y
otros

      Recurridos

Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez.

      San Juan, Puerto Rico, a 30 de septiembre de 2003.

      En el presente caso el Tribunal de Circuito de Apelaciones, a través de una mayoría de los miembros del Panel compuesto por el Juez Sánchez Martínez, la Jueza Cotto Vives (Disintió) y el Juez Urgell Cuebas (Ponente), dispuso en el dictamen recurrido lo siguiente:

SENTENCIA

      En San Juan, Puerto Rico, a 31 de agosto de 2000.

      Los demandados apelantes, Dr. Ramón Badillo Santiago, su esposa, Sra. Ada Padilla y la sociedad de gananciales compuesta por éstos, nos solicitan que revoquemos la sentencia del Tribunal de Primera Instancia, Sala Superior de Bayamón, que ordenó la cancelación de la inscripción de su titularidad sobre cierto inmueble y le impuso el pago de veinte mil dólares ($20,000) en concepto de daños y perjuicios a favor de la apelada, Sra. Amparo Fuentes González, más las costas del litigio y cuatro mil

dólares ($4,000) en concepto de honorarios de abogado.

Señalan los apelantes, entre otros, que incidió el tribunal *a quo* al no proveer un acomodo razonable al Dr. Badillo Santiago debido al impedimento auditivo de éste, según requerido bajo el Americans with Disabilities Act of 1990, 42 U.S.C.A. secs. 12101 *et seq*.

Examinados los hechos particulares del caso de autos, concluimos que los arreglos provistos por el tribunal no constituyen, en forma alguna, el acomodo razonable requerido en ley, por lo que procedemos a dejar sin efecto la sentencia apelada y ordenar se celebre nuevo juicio.

El 9 de agosto de 1995 la Sra. Amparo Fuentes González presentó una demanda contra los apelantes, solicitando que se declarase la nulidad de la escritura de compraventa de una residencia, adquirida por estos últimos. Solicitó de los apelantes, además, daños y perjuicios por angustias y sufrimientos mentales. Los apelantes contestaron la demanda y presentaron una reconvención contra la Sra. Fuentes González.

En la vista en su fondo del caso, el tribunal *a quo* denegó la solicitud formal del Dr. Badillo Santiago y su esposa sobre nulidad de los procedimientos y nuevo juicio. Éstos reiteraron que no se le había concedido el acomodo razonable al Dr. Badillo Santiago debido a su impedimento auditivo bajo el Americans with Disabilites (sic) Act, <u>supra</u>.

Inconformes con la sentencia dictada, los apelantes presentaron ante este Foro un escrito de apelación en el cual reiteran su alegación de que no se les proveyó el acomodo razonable al cual tienen derecho en ley.[5]

Específicamente, señalan que el tribunal *a quo* cometió los siguientes errores:

---

[5] El Dr. Badillo Santiago presentó ante el Tribunal de Distrito Federal para el Distrito de Puerto Rico una demanda civil contra varios funcionarios del Estado Libre Asociado de Puerto Rico, caso Núm. 98-1993 (SEC), en la cual alega se violaron sus derechos bajo el Americans with Disabilites (sic) Act, <u>supra</u>, dado que no se le proveyó el acomodo razonable aquí concernido.

1. La negativa a proveerle al [a]pelante Ramón Badillo un acomodo razonable de acuerdo a su impedimento auditivo y ante dicha negativa, a[l] no detener y/o suspender los procedimientos hasta conseguir el acomodo solicitado. En la alternativa, debió el Tribunal conceder la solicitud del nuevo juicio.

2. Le violó el derecho de la [a]pelante Ada Padilla a ser escuchada y en su consecuencia se le privó de su propiedad sin el Debido Proceso de Ley. La Apelante solicitó la posposición de la continuación de la vista señalada para el 8 de septiembre de 1997, ya que episodio de alta presión le impedía participar en los procedimientos según la opinión de un facultativo, especialista del corazón.

3. No le permitió al Apelante presentar el testimonio del Notario Carlos L. González Alonso aún cuando éste solicitó al Tribunal un señalamiento posterior ya que compromisos previos le impedían asistir el día de la vista, 8 de septiembre de 1997. En sustitución del testimonio del Notario González Alonso el tribunal aceptó la transcripción de la deposición que se le tomó el 4 de septiembre de 1996. El tribunal de instancia ignoró por completo el contenido de la deposición y en particular el relato que hace el notario del acto del otorgamiento de la escritura número 20 de 19 de julio de 1995.

4. El Tribunal no tomó en consideración el hecho de que la Apelada falsificó la designación de beneficiarios en EDUCOOP después de fallecida su hermana Amalia. Éste hecho junto a otros pone de manifiesto el carácter de la Apelada y una propensidad a apartarse de la verdad.

5. Al condenar a la Apelante al pago de daños en ausencia de prueba y sin tomar en consideración evidencia en

contrario, que excluye la concesión de daños.

Toda vez que el primer error fue claramente cometido por el Tribunal de Primera Instancia, el cual requiere que se revoque la sentencia y se celebre nuevo juicio, no pasaremos a discutir y resolver los restantes errores, los cuales van dirigidos a aspectos procesales y evidenciarios.

**A**

Los apelantes aducen en el primer señalamiento de error que incidió el tribunal *a quo* al no suministrar acomodo razonable al Dr. Badillo Santiago para su impedimento auditivo, según provee el "Americans with Disabilites (sic) Act of 1990", <u>supra</u>.

Para dilucidar los méritos del señalamiento es necesario que repasemos en detalle los hechos pertinentes a la controversia, según se desprenden de la exposición narrativa de la prueba y del expediente en apelación.

La vista en su fondo comenzó el 2 de septiembre de 1997. Luego de tomarse el juramento a los testigos, pero <u>antes</u> de comenzar el interrogatorio de éstos, el Lcdo. José A. Rivera Valencia, representante legal de la parte demandada, <u>indicó que el Dr. Ramón Badillo Santiago tenía problemas de audición, pero que a pesar de ello, le interesaba escuchar el testimonio vertido en el caso.</u>[6] El Juez le indicó que no tenía problemas con que el Dr. Badillo Santiago se sentara al lado de la primera testigo, la codemandada, su esposa, para poder escucharla desde más cerca. Exposición Narrativa de la Prueba, página 1, en adelante, (ENP pág. 1).

El Dr. Badillo Santiago fue la segunda persona en declarar en el juicio, siendo interrogado por la parte demandante como testigo hostil.[7] Antes de comenzar a testificar, el Dr.

_____

[6] El Dr. Badillo Santiago es una persona de edad avanzada, retirado, y residente en el Estado de la Florida.

[7] El Juez dictaminó que en el turno de la parte demandante sólo se cubriría el testimonio pertinente a las alegaciones de la parte demandante. Los testimonio del Dr. Badillo

Badillo Santiago formuló el siguiente pedido o aclaración, (ENP págs. 5 a 6):

El Dr. Badillo indica que quiere hacer una aclaración. Que él no oye y que a veces habla en voz demasiado alta y le dicen "baja la voz", que él mismo no se oye. Le pide al Lcdo. Nelson Rosario [abogado de la parte demandante] que se mantenga en un solo sitio y que no se esté moviendo porque cuando éste se mueve ocho pies más allá de donde está no lo va a oír.

Indica que entonces quedaría de parte de la corte proveerle un sistema de rayos infra-rojos con un "transmitter" y que él tiene un "receiver" y entonces le pueden hablar por micrófono y él lo oye, pero que si él se mueve de sitio a sitio se va a perder el tiempo y este es un caso bastante complejo, una cuestión de principios y éstos no se negocian. (Énfasis en el original.)

El Juez dice "Bueno, basta. Del podio que se dirija la pregunta. Él tiene un problema mecánico, de que no puede oírlo si usted va caminando porque el oído de él no se ajusta."

DIRECTO:

El Lic. Nelson Rosario comienza a hacer sus preguntas. Le hace dos preguntas y el Dr. Badillo indica que no oye.

El Dr. Badillo indica que si se puede hacer la pregunta por escrito, sería perfecto.

El Lic. Nelson Rosario le pregunta su nombre. El Dr. Badillo indica que la última parte no la oyó.

El Juez le indica al Lcdo. Rosario: "Va a tener que hablar, abrir la boca, ser claro porque es evidente que tiene dificultad para escuchar". Repite el Juez, "Tiene dificultad para escuchar." (Énfasis en el original.)

Durante el interrogatorio directo del Lcdo. Rosario, el Dr. Badillo Santiago "[e]xpresó que escuchó el testimonio de su esposa [la Sra. Ada

---

Santiago y de su esposa, Sra. Ada Padilla, sobre sus defensas a la demanda y su reconvención, quedaron pendientes para ser presentados luego de oírse todos los testigos de la parte demandante.

Padilla] pero que no lo pudo oír todo" (ENP pág. 7), a pesar de que, según antes indicado, se le permitió sentarse al lado de la testigo durante el interrogatorio. Más tarde, "El Juez le hizo varias preguntas que él no oyó." (ENP pág. 9).

El segundo día de la vista, a mitad del testimonio de la demandante, Sra. Amparo Fuentes, surgió la siguiente interacción entre el Lcdo. Rivera Valencia, abogado de la parte demandada y el juez. (ENP pág. 27).

El Lic. José A. Rivera Valencia indica que quisiera presentarle una preocupación. Que su cliente le ha informado que no puede escuchar bien lo que se ha dicho, el testimonio. Que él conoce de ninguna forma que tenga el Tribunal para estos casos.

El Juez indica que se puede sentar con el abogado, si quiere, para oír mejor.

El Lic. Rivera Valencia le dice al Dr. Badillo que si quiere se puede venir a un sitio. El Dr. Badillo expresa que anteriormente no escuchó el testimonio de la ... (ininteligible) que ofrecieron ellas. Que no ... (ininteligible), no va a tener una oportunidad ... (ininteligible). (Énfasis en el original.)
El Lic. Rivera Valencia le pregunta dónde sería mejor al Dr. Badillo. Se escuchan comentarios (ininteligible).

El Juez expresa que él no sabía si ha escuchado o no, pero que quería hacer constar para el registro que lo visto muy atento como si escuchara, y lo ha oído (¿visto?) hacer gesticulaciones y aprobación y de denegación al testimonio como si estuviese entendiendo, lo cual le sorprendió porque le llamó la atención porque se había quejado de que no podía oír al licenciado que le estaba hablando, ni a él. Que sin embargo, con lo bajito que hablaba ella él podía notar que él aparentemente de lo que estaba observando, sí entendía. Que eso era lo único que podía decir.

Continúa diciendo el Juez que él no está diciendo lo que él le informó. Que dice para récord lo que había observado. Que ahora que él menciona que no ha escuchado, quiere mencionar para récord que sí, que lo ha estado observando durante todo el testimonio de los demás testigos haciendo gestos de aprobación y de denegación,

tal como si estuviese entendiendo perfectamente todo lo que está diciendo, para sorpresa de él porque él había alegado que no oía bien. Y que claro ... (ininteligible) que muchos de los testimonios han sido bien bajitos.

Durante el segundo día de la vista la parte demandante completó la presentación de sus testigos. Para el final del segundo día la parte demandada estaba comenzado el interrogatorio directo del codemandado, Dr. Badillo Santiago.

Al reanudarse la vista el lunes, 8 de septiembre, pero antes de reiniciarse el interrogatorio a los testigos, el Lcdo. Rivera Valencia presentó en corte abierta el siguiente planteamiento. (ENP págs. 47 a 48).

.... Procede a relatar que desde el primer día el Dr. Badillo ha alegado que no puede escuchar bien. Que pudo escuchar porque se le permitió alzar la voz. No podía escuchar la preguntas que le hicieron a su esposa. Que pudo entender algo cuando el Juez y los abogados hicieron preguntas en tono alto y él pudo entender algo, aún cuando tuvo dificultades para recibirlas y entenderlas, que se ha mantenido en el juicio, pero la distancia entre él y los testigos han imposibilitado su entendimiento en el presente caso. Ha afectado su comunicación con los abogados. Que el día 3 de septiembre de 19977 [sic] solicitaron al Tribunal que indicara si existía alguna forma de solucionar el problema. El Tribunal indicó que desconocía e informó, indicó en el récord que había notado al demandado gesticulando lo que pasaba en el juicio. Que el Dr. Badillo trata de prestar atención para poder entender lo que dicen los testigos, pero que eso no indica que esté recibiendo los mensajes, que a veces reacciona al comportamiento no verbalizado de las partes, aunque no percibe el mensaje verbal, y que a veces hace gestos porque está pensando en otras cosas.

Dice que expresamente rechaza cualquier afirmación que pueda ser interpretada como que está fingiendo no oír, y entiende que se están afectando sus derechos en el juicio al ignorar su impedimento auditivo. Para aclarar este aspecto, se sometió el 6 de septiembre a un examen auditivo con la audióloga clínica, que confirma que el demandado necesita que le hablen a no más de cuatro pies de distancia, aún cuando está usando "otoamplífonos" y que se utilice labio

lectura. Que de tal evaluación se desprende que el demandado no ha podido entender la mayoría del presente juicio y se acompañó copia del resultado de la evaluación y de las pruebas practicadas. Que se están afectando su derecho constitucional a la Confrontación de la Constitución de los Estados Unidos de América y de Puerto Rico. Que bajo la ley ADA, Ley de Americanos con Impedimentos, toda entidad pública o privada, incluyendo la Administración de Tribunales, hay que hacer un acomodo razonable, que no represente una carga injusta, para que los ciudadanos con incapacidad puedan tener igual oportunidad de acceso a servicios públicos, y a limitar aquellos impedimentos que puedan resultar, ser discriminatorios, o tener un efecto discriminatorio. Que entienden que las facilidades del Tribunal no están preparadas para bregar con problemas de personas con comunicación auditiva para que puedan escuchar lo que dicen las personas, y tampoco se le da a la persona un equipo amplificador del sonido, o una transcripción de lo declarado, para él poder entender lo que se dice aquí. Que en otros estados se brinda tal servicio. Que la realidad es que no ha podido entender la mayoría del juicio. Se solicitó que se anulara el juicio, y se hiciera un señalamiento para nuevo juicio. Se solicitó que la administración de Tribunales le provea algún acomodo razonable a su impedimento y de no concederse entenderían que se estaría violando el debido proceso de ley, la igual protección de las leyes, la cláusula sobre inmunidad y privilegios a los ciudadanos no residentes en Puerto Rico, al igual que las disposiciones constitucionales mencionadas.

El Juez indica que la moción ha sido radicada en esos momentos y que antes de resolverla se decretaría un breve receso.

La referida moción señala, en esencia, que el codemandado solicitó desde el primer día el acomodo respecto a su impedimento auditivo; que él se mantuvo presente en el juicio, pero que la distancia entre él, los testigos y los abogados imposibilitaron el entendimiento de lo vertido por éstos, lo que a su vez afectó adversamente la comunicación con su representante legal. En ésta aduce también, que bajo el Americans With Disabilities Act of 1990, 42 U.S.C.A. secs. 12101 *et seq*, toda entidad pública tiene la obligación de proveer un acomodo razonable a los auditivamente impedidos para que éstos tengan

igual acceso a los servicios públicos. Señala en su escrito, que no se le proveyó el equipo que le permita oír o entender los procedimientos, u oportuna transcripción de lo declarado tal como por medio de un equipo "close-captioned". Indicó que él estaba dispuesto a pagar el costo razonable de dichos servicios. Finalmente, aduce que ante la realidad de que no se le había provisto el acomodo razonable, procedía que se anulase el juicio y se señale una nueva vista para que la Administración de los Tribunales le provea un acomodo razonable para su impedimento auditivo.

La moción fue acompañada con el informe del audiólogo clínico, el cual incluye los datos técnicos sobre las pruebas efectuadas. El audiólogo indicó, que "[e]sta dificultad en la discriminación del habla dificulta el entender [el] habla aún con el uso de otoamplífonos, por lo cual el paciente necesita que le hablen de cerca a una distancia no mas lejos de cuatro (4') pies y utilizar labio lectura." (Énfasis en el original.)

Al reanudarse la vista el Juez emitió las siguientes directrices y resolvió en corte abierta la moción, (ENP págs. 49 y 50.)

[El Juez le indicó al alguacil] que se le provea al señor Badillo un asiento para que él se siente dentro de la sala donde pueda oír. El Alguacil procede a buscar un sitio. El Juez le indica que Badillo se puede mover en la sala a donde pueda escuchar libremente, que no hay problemas con el Tribunal. Que si no oye que puede levantarse, que si quiere que se repita algo, que se lo diga a él y él da órdenes.[8]

El Tribunal le indica que al Lic. Rosario que continúe con su exposición. Indica que lo único sería lo de justicia sustancial. Indica que él tiene dos abogados que lo representan. Que la demanda se radicó en el 1995 y ya para esa fecha el señor era sordo, o tenía problemas auditivos. Que debieron radicar una Moción con suficiente anticipación al juicio. Que sería una violación al derecho de la demandante.

---

[8] En esta ocasión, lo que proveyó el tribunal *a quo* al Dr. Badillo Santiago fue una silla con ruedas para que se pudiese mover de un lado hacia otro de la sala.

El Juez expresa que ha estudiado bien la Moción de Nuevo Juicio. Indica que no le asiste la razón. Que el Tribunal le proveyó el acomodo razonable consistente en que le interrogara el abogado de la parte demandante desde un mismo lugar, cerca de él. Que posterior a eso no se volvió a solicitar del Tribunal una medida similar, por lo que no se proveyó, no solicitó el mismo. El otro acomodo fue permitirle sentarse en el primer banquillo izquierdo de la sala, cerca de donde se sientan los testigos a declarar, a unos diez o doce pies. De esta forma renunció a su derecho a estar sentado al lado de su abogado. Que ahora acaban de ordenar que se le provea una silla con ruedas para que éste se acomode donde entienda que puede oír mejor y si no entiende, que haga una señal. Indica el Tribunal que le llamó la atención que al estar sentado de diez a doce pies estuvo muy atento a la declaración de todos los testigos, y respondió instantáneamente de manera corporal y parcial al contenido de dichos testimonios con gesticulaciones y movimientos, incluyendo cambios de color en su semblante. Además de otros tipos de conducta. Finalmente el Tribunal entiende que de haberle asistido la razón el derecho fue renunciado por su propia conducta o no haber sido reclamado oportunamente.

Se continuó con los procedimientos.

El Lic. Rivera Valencia hace una observación de algo que se dijo el último día sobre las órdenes del Tribunal.

El Lic. Rivera Valencia informa que ha conversado con su cliente y que él entiende que no debe continuar el directo que se estaba llevando a cabo, que él no va a continuar declarando. ... . (Énfasis en el original.)

En resumen, desde el mismo comienzo de la vista el Dr. Badillo Santiago indicó que tenía problemas auditivos, pero que le interesaba escuchar los testimonios vertidos en el caso. Al declarar el Dr. Badillo Santiago, reiteró personalmente su solicitud, indicando que "quedaría de parte de la corte proveerle un sistema de rayos infrarrojos con un 'transmitter'". El segundo y tercer día de la vista, personalmente y a través de su abogado, continuó solicitando "acomodo razonable". Ante, lo que desde su perspectiva fueron acomodos inadecuados ofrecidos por el tribunal, al tercer

día presentó una extensa moción, reclamando expresamente sus derechos bajo el Americans with Disabilities Act y el debido proceso de ley. Finalmente, ante la inatención o incapacidad del tribunal para proporcionar el acomodo razonable solicitado, el Dr. Badillo Santiago rehusó continuar declarando a su favor.

**B**

Los reclamos del Dr. Badillo Santiago para que se le proveyese acomodo razonable están fundamentados, entre otros, en lo provisto por el estatuto federal "Americans With Disabilities Act of 1990", 42 U.S.C.A. secs. 12101 *et seq*., en adelante "ADA". El propósito de dicho estatuto está plasmado en el inciso (b) de su primera sección, 42 U.S.C.A. sec. 12101(b), como sigue:

Sec. 12101. Findings and purposes

(a) ... .

(b) Purpose

It is the purpose of this chapter-

(1) to provide a clear and comprehensible national mandate for the elimination of discrimination against individuals with disabilities;

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

En vista de la naturaleza remedial de la Ley ADA, la cual es un estatuto diseñado para eliminar el discrimen contra las personas con

impedimentos en todas las esferas de la sociedad, éste se ha de interpretar liberalmente para que se logren sus propósitos. Kinney v. Yerusalim, 812 F. Supp. 547, (E.D. Pa. 1993), aff'd 9 F.3d 1067 (3rd Cir. 1993), cert. denied 114 S. Ct. 1545, 128 L.Ed. 2d 196 (1994).

Las disposiciones de ADA son directamente aplicables a Puerto Rico por disposición expresa del Congreso. 42 U.S.C.A. sec. 12102(3).[9]

La Ley ADA consiste de una parte general y cuatro subcapítulos. De éstos, el Subcapítulo I reglamenta los aspectos de empleo y el Subcapítulo II cubre los servicios públicos provistos por los gobiernos estatales y municipales, incluyendo sus departamentos, agencias y otras instrumentalidades, 42 U.S.C.A. sec. 12131. El Subcapítulo II establece como norma central lo siguiente:

Sec. 12132 Discrimination

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Éste provee las siguientes dos definiciones para delimitar el contenido de la frase "qualified individual with a disability", en cuanto a los servicios provistos por los gobiernos estatales y municipales.[10]

Sec. 12102. Definitions

As used in this chapter:

---

[9] 42 U.S.C.A. 12102(3) provee:

The term "State" means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico,... (Énfasis en el original.)

[10] El Subcapítulo I, en 42 U.S.C.A. 12111(8), provee otra definición de "qualified individual with a disability", a aplicarse a las situaciones relacionadas a empleo.

(1) Auxiliary aids and services

The term "auxiliary aids and services" includes–

(A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;

(B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;

(C) acquisition or modification of equipment or devices; and

(D) other similar services and actions.

Sec. 12131. Definition

As used in this subchapter:

(1) ... .

(2) Qualified individual with a disability

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. (Énfasis en el original.)

Finalmente, en 42 U.S.C.A. sec. 12134 el Congreso proveyó para que el Procurador General de los Estados Unidos promulgara un reglamento que implementase el Subcapítulo II de ADA. Éste, al cual nos referiremos en adelante como el "Reglamento", se tituló: "Part 35 – Nondiscrimination on the Basis of Disability in State and Local Government Services". El mismo fue efectivo el 26 de enero de 1992 y ha sido

codificado como 28 CFR Part 35. La sección 28 CFR sec. 35.104 amplió el listado de "auxiliary aids and services", de forma que ahora dicho término incluye, entre otros, los siguientes:

(1) Qualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, _assistive listening devices, assistive listening systems,_ telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunication devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments;

... ; and

(4) Other similar services and actions. (Énfasis en el original.)

Al interpretar el significado de la prohibición contra la discriminación y los medios requeridos para cumplir con ésta, el Reglamento elaboró sustancialmente lo provisto por ADA. Por ello, resulta necesario examinar el Reglamento para determinar si la entidad pública está cumpliendo con el requisito de no discriminar contra las personas con impedimentos. Las siguientes partes del Reglamento, entre otras, son pertinentes para evaluar la situación de autos:

Subpart B – General Requirements

35.130 General prohibitions against discrimination.

(a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other

arrangements, on the basis of disability –

   (i) ... ;

   (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

   ... ;

   (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

   (2) ... .

   ... .

   (7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. (Énfasis en el original).

   (8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

   ... .

Subpart E -- Communications

35.160 General.

(a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

(b)(1) <u>A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity</u>.[11] (Énfasis en el original.)

_____

[11] Entre otros, el Departamento de Justicia Federal proveyó el siguiente comentario respecto a la Regla 28 CFR 35.160:

Section 35.160 requires the public entity to take such steps as may be necessary to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

Paragraph (b)(1) requires the public entity to furnish appropriate auxiliary aids and services when necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, the public entity's service, program, or activity. The public entity must provide an opportunity for individuals with disabilities to request the auxiliary aids and services of their choice. This expressed choice shall be given primary consideration by the public entity ({35.160(b)(2)). The public entity shall honor the choice unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under {35.164.

Deference to the request of the individual with a disability is desirable because of the range of disabilities, the variety of auxiliary aids and services, and different circumstances requiring effective

(2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

... .

35.164 Duties.

This subpart does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with this subpart would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action required to comply with this subpart would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the

---

communication. For instance, some courtrooms are now equipped for "computer-assisted transcripts," which allow virtually instantaneous transcripts of courtroom argument and testimony to appear on displays. Such a system might be an effective auxiliary aid or service for a person who is deaf or has a hearing loss who uses speech to communicate, but may be useless for someone who uses sign language.

> maximum extent possible, individuals
> with disabilities receive the benefits
> or services provided by the public
> entity. (Énfasis en el original.)

En resumen, el Subcapítulo II de ADA y el Reglamento, incluyen en la definición de "qualified individual with a disability" a aquella persona que, si se le suplen los equipos de ayuda auxiliares, puede participar en igualdad de condiciones en los servicios que provee una entidad gubernamental. Si dicho individuo solicita que se le provea un acomodo razonable, la entidad gubernamental viene obligada a proveérselo, preferiblemente mediante el tipo de acomodo solicitado por el individuo.

La entidad gubernamental no tiene que proveer el acomodo solicitado si proveerlo conllevaría una alteración de la naturaleza fundamental del servicio provisto o conllevaría un "undue financial or administrative burden". La decisión ha de ser hecha por el jefe de la entidad gubernamental, o por la persona designada por éste, y ha de estar acompañada de una comunicación escrita donde exponga dichos hechos. En tales casos, la entidad gubernamental ha de proveer el mejor acomodo posible, que no altere la naturaleza fundamental del servicio o cause una carga financiera desmedida.

### C

Por disposición expresa de la Ley ADA, ésta rige en Puerto Rico y es de aplicación al gobierno de Puerto Rico y sus instrumentalidades, incluyendo a la Oficina de Administración de los Tribunales. En lo que concierne al caso de autos, el Subcapítulo II y su reglamento, titulado "Nondiscrimination on the Basis of Disability in State and Local Government Services"[12], requieren que las entidades gubernamentales no excluyan a las personas con impedimentos físicos de participar o recibir sus servicios. De aquí surge la obligación de proveer un acomodo razonable a éstas, de manera que puedan participar y recibir los servicios que se proveen.

Desde el comienzo del litigio, en el párrafo veinte (20) de la contestación a la demanda, el Dr. Badillo Santiago indicó su impedimento

---

[12] 28 CFR Part 35.

auditivo. Al inicio de la vista evidenciaria éste volvió a traer a la atención del tribunal su impedimento auditivo e indicó que "quedaría de parte de la corte proveerle un sistema de rayos infrarrojos con un 'transmitter'"[13].

En caso que existiese cualquier duda sobre la existencia o gravedad de su impedimento, el informe del examen audiológico estableció definitivamente que, aún utilizando su otoamplífono y lectura de labios, lo más lejos que el Dr. Badillo Santiago podía discernir lo hablado era a cuatro (4) pies de distancia.

El primer día de la vista el juez aceptó la existencia del impedimento auditivo. Éste expresó, dos veces, que el Dr. Badillo Santiago tenía dificultad para escuchar y ordenó que el abogado que lo interrogaba lo hiciese desde el podio, sin moverse del sitio, hablando en forma clara y en volumen alto.

Ahora bien, el Dr. Badillo Santiago había expresado su interés de poder seguir el interrogatorio de los otros testigos, lo cual incluye poder oír las preguntas, las respuestas de los testigos y los comentarios de los otros abogados y del juez. Ello requería que se le proveyese la utilización de equipos de ayuda auxiliares ("auxiliary aids"), como los solicitados.[14] Además, su participación completa requería el poder comunicarse en forma efectiva con su abogado durante el transcurso del juicio, para así poder ayudar en la presentación de su caso.

El Dr. Badillo Santiago expresó claramente que el acomodo que le fue provisto no le permitía

---

[13] Aparentemente, el Dr. Badillo Santiago poseía audífonos con recibidor de señal infrarroja que había utilizado en los tribunales del estado de la Florida.

[14] El equipo solicitado consistía de una unidad capaz de conectarse a la señal que proviene de los micrófonos y se graba en cinta magnetofónica en la sala de vistas. La misma sería transmitida utilizando luz infrarroja u ondas de radio. Ésta sería recibida por otra unidad, consistente de una combinación de recibidor y audífonos, la cual es utilizada por la persona con el impedimento auditivo. Esta última es similar a la utilizada por una persona con audición normal, conocida como un audífono inalámbrico.

seguir el interrogatorio de los otros testigos. Además, los arreglos que sugirió y proveyó el juez no le permitían estar sentado al lado de sus abogados y así cooperar en la presentación de su caso.

El acomodo ofrecido al Dr. Badillo Santiago fue claramente inadecuado. Dada la limitación de su percepción auditiva a la distancia de cuatro (4) pies, aún en comunicación cara a cara, a éste le era imposible seguir los interrogatorios. El arreglo propuesto por el tribunal el tercer día tampoco solucionaba la situación, ni constituyó un acomodo razonable. Debido a la localización física en la sala del tribunal de los testigos, el abogado que interroga y el abogado de la parte contraria, así como el juez, era físicamente imposible para el Dr. Badillo Santiago estar simultáneamente, a cuatro pies de distancia y cara a cara con cada uno de ellos, para escuchar lo dicho por éstos. El acomodo provisto fue insuficiente, pues éste hubiese tenido que moverse continuamente en la silla de ruedas, de un lado hacia otro para poder escuchar lo que los abogados, el juez y los testigos decían, sobre todo en un escenario donde el diálogo se lleva a cabo con mucha fluidez y rapidez. También, ello requería que tuviese la habilidad inconcebible de predecir quién era el próximo que haría uso de la palabra, para así colocarse cara a cara y escucharlo. Basta tomar conocimiento judicial de la ubicación del personal en la sala del tribunal, para comprender que este acomodo era logísticamente ineficaz, además de ser gravoso para el apelante, quien era una persona de edad avanzada, o para cualquier otra en condiciones similares.

Cabe señalar, que fue un error de sano juicio del juez que presidió la vista decidir continuar los procedimientos judiciales bajo las circunstancias expuestas. Ante el reclamo genuino del apelante, al cual tenía pleno derecho, el juez debió paralizar los procedimientos para solicitar que la Oficina de Administración de los Tribunales (OAT) le proveyese los "auxiliary aids" necesarios, según descritos en 28 CFR sec. 35.104. De esta manera se le hubiese brindado la oportunidad a la OAT de cumplir con su deber afirmativo de proveer igualdad de acceso al apelante. También, si no contaba con los recursos o resultaba muy oneroso proveer el acomodo solicitado, denegarlo exponiendo sus fundamentos.

Es evidente que el juez trató de la mejor buena fe de remediar o resolver la situación planteada ante su consideración con los recursos que tenía en ese momento disponibles. También, no perdemos de vista de que se trataba de una situación novel suscitada en nuestra jurisdicción, aunque reconocemos que la Ley ADA y su reglamentación llevan más de ocho años de vigencia. Como expresamos anteriormente, tan pronto surgió la petición del Dr. Badillo Santiago, lo procedente era paralizar los procedimientos judiciales y requerir de las autoridades pertinentes de la OAT que evaluasen la misma. Después de todo, no le corresponde al juez que preside una vista, ni está dentro de su competencia, proveer el equipo solicitado por el Dr. Badillo Santiago. Es función de los administradores de la OAT realizar las gestiones para adquirir y proveer el equipo que sea necesario para cumplir con las disposiciones de la Ley ADA.

En resumen, concluimos que el acomodo ofrecido no fue razonable. Es evidente que el Dr. Badillo Santiago, mediante la utilización de los "auxiliary aids", descritos en 28 CFR sec. 35.104 como "assistive listening devices o assistive listening systems", hubiese podido participar, como todo litigante, en igualdad de condiciones, en los procedimientos judiciales que se condujeron ante el tribunal.

Se cometió el primer error señalado, por lo que procede la revocación de la sentencia.

Finalmente, el caso de marras debe servir para reflexionar y crear consciencia en todos nosotros, los jueces, los administradores y el personal de la OAT, sobre la necesidad imprescindible de atender y resolver con prontitud y adecuacidad los reclamos legítimos de las personas con impedimentos físicos que acuden a la Rama Judicial. Estimamos que resulta altamente deseable que se establezcan unas normas o procedimientos administrativos adecuados y efectivos para responder a solicitudes de esta naturaleza, y se oriente sobre éstos a todo el personal, incluyendo a los jueces. Ciertamente, ésta no será la primera ni la última vez que nos confrontemos con situaciones iguales o similares.

**D**

En atención a lo antes discutido, se deja sin efecto la sentencia apelada y se ordena la celebración de un nuevo juicio. La Oficina de Administración de los Tribunales evaluará la petición del Dr. Badillo Santiago y le proveerá el acomodo razonable solicitado, salvo que tenga razones válidas para denegarlo, conforme la reglamentación aplicable.

Notifíquese con copia a las partes y a la Directora Administrativa de los Tribunales.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.

La Jueza Cotto Vives disiente mediante opinión escrita.


                         (fdo.) Aida Ileana Oquendo Graulau
                                Secretaria General

Concluimos que la anterior Sentencia emitida por el Tribunal de Circuito de Apelaciones en el presente caso es JUSTA y CORRECTA en derecho, por lo que DISENTIMOS de lo actuado por la Mayoría al revocarla. Suscribimos su contenido en todos sus extremos. Entendemos que la norma jurisprudencial aquí formulada es contraria a los derechos dispuestos a favor de las personas impedidas, por virtud de la política pública formulada por el Congreso de Estados Unidos en el estatuto conocido como "American with Disabilities Act of 1990", supra. Atenta, además, contra la dignidad humana de este tipo de personas impedidas, y es violatorio de su derecho a un debido proceso de ley, a tenor con la Constitución de Estados Unidos y la de Puerto Rico.


Efraín E. Rivera Pérez
Juez Asociado